**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

KERI BRAGG et al.,

                         Plaintiffs,

v.                                          CIVIL ACTION NO.   2:19–cv–00231

WAL–MART STORES, INC.,

                         Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Walmart Inc.'s ("Walmart") Motion for Summary Judgment.[1]   (ECF No. 94.)   For the reasons discussed more fully below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion.

*I.    BACKGROUND*

Plaintiffs Roberta Crites and Tammy Harrison[2] (collectively "Plaintiffs") filed this action alleging Defendant discriminated against Plaintiffs on the basis of their sex in violation of Title VII of the Civil Rights Act of 1964.   (ECF No. 1 at 1, ¶ 3.)   These Plaintiffs were members of the previously certified national class in *Dukes v. Wal–Mart Stores, Inc.*, 564 U.S. 338 (2011). (ECF No. 28 at 2, ¶¶ 6–7.)   In *Dukes*, the United States District Court for the Northern District of

---

[1] Also pending is Defendant's Motion to Strike Plaintiffs' Reference to Previously Undisclosed Documents.   (ECF No. 104.)   In response, Plaintiffs agreed not to file the exhibits at issue.   (ECF No. 107.)   Accordingly, Defendant's motion, (ECF No. 104), is **DENIED AS MOOT**.

[2] Defendant advises that Plaintiffs Keri Bragg, Marlene Justice, and Charlotte Samples have agreed to settle their claims. Accordingly, the claims brought by Plaintiffs Keri Bragg, Marlene Justice, and Charlotte Samples are **DISMISSED**.

1

California certified a national class of female Walmart and Sam's Club employees challenging Walmart's retail store pay and management promotion policies as discriminatory against women. On June 20, 2011, the United States Supreme Court reversed that class certification order.  *See Dukes v. Wal–Mart*, 564 U.S. 338 (2011).

While the certification order was on appeal, the time periods for filing charges with the Equal Employment Opportunity Commission ("EEOC") were tolled.  (ECF No. 28 at 2, ¶ 7.) After the class was decertified, the District Court for the Northern District of California entered an order further extending this tolling period for the former class members.  (*Id.* at 2–3, ¶ 8.)  Here, Plaintiffs both filed their EEOC charges on May 1, 2012.  (*Id.* at 3, ¶¶ 11–12.)  Crites received her right to sue letter on March 11, 2019, and Harrison received her letter on March 26, 2019. (*Id.*)  Plaintiffs were required to file the current action within 90 days of the receipt of the letter. (ECF No. 100 at 4.)

### A. *Walmart's Management Structure*

Plaintiffs worked in Walmart stores located mostly in West Virginia from 1996 to the present.  Walmart groups multiple stores into Markets, formerly called Districts, and each Market is supervised by a Market Manager, formerly called a District Manager.  (ECF No. 95 at 2.) Markets are grouped into Regions and the Regions are led by Vice Presidents who are based at Walmart's headquarters.  (*Id.*)

Each individual Walmart store has the same job categories, job descriptions, and management hierarchy.  (ECF No. 28 at 5, ¶ 25.)  Hourly associates are signed to a specific department and report to and are evaluated by the respective Department Manager.  (ECF No. 95 at 3.)  The store is divided into departments and each department is supervised by a Department

Manager.   (*Id.* at 2.)   The Department Manager position is an hourly supervisory position that reports to and is evaluated by the Assistant Store Manager over that department.   (*Id.*)   Assistant Store Managers are the lowest salaried management position within each store and report to and are evaluated by either a Co–Manager or the Store Manager.   (ECF No. 98 at 6, ¶ 10.)   There are not Co–Managers in every store, but, at stores where the position exists, the Co–Manager reports to and is evaluated by the Store Manager with approval from the Market Manager.   (*Id.*)   Further, some stores have Support Managers, which are hourly employees that assist salaried management but are not assigned to a specific area, and Zone Supervisors, which are hourly supervisory employees that oversee specific areas of the store.   (*Id.*)   Finally, each store is led by a Store Manager who makes key decisions within the store and delegates responsibilities to other salaried managers.   (ECF No. 95 at 3.)

### B.   Relevant Pay Policies

Each Walmart Store has its own Facility Start Rate which sets the minimum starting rate within that store.   (*Id.*)   Further, every position at the store is assigned a code that corresponds to a pay range that is based on the Facility Start Rate.   (*Id.*)   There may also be certain jobs in each store that are paid differently depending on the shift the employee works, such as the overnight shift.   (*Id.*)

### 1.   Hourly Employees Pay Policies

Hourly employees at Walmart received annual pay adjustments based on the employee's annual performance evaluation, and any pay increase was determined by Walmart's pay guidelines and the employee's evaluation score.   (*Id.*)   Further, the pay increase given for an evaluation score changed over time.   (*Id.*)   Hourly employees also received a pay increase when the

3

employee was promoted or moved to a position with a higher pay grade.   (*Id.*)   Prior to 2006, hourly employees could receive a merit increase for exceptional performance and exceptional results.   (*Id.* at 4.)   However, these merit raises were eliminated in 2006.   (*Id.*)

### 2.   Assistant Store Manager Pay Policies

Assistant Store Manager pay starts at a base salary that is adjusted based on the size and location of the Walmart Store where the manager is employed.   (*Id.*)   Some Assistant Store Managers with experience are offered higher starting rates.   (*Id.*)   Store Managers, with input from the District Manager and potentially the Regional Personnel Manager, made the decisions about adjusting the starting salary.   (*Id.*)   Further, Assistant Store Managers also received annual evaluations and may have been eligible for annual performance increases, determined by the annual evaluation score, the managers current pay, and the size of the store.   (*Id.*)   The annual performance evaluations were conducted by the Store Manager, with input from the District Manager and the Regional Personnel Manager.   (*Id.*)

### C.   Relevant Promotion Policies

Employees must meet eligibility criteria to be considered for transfers and promotions. Walmart considers the employees work experience in working at Walmart or at another retail store; performance evaluation; coaching history; and the amount of time the employee has held her current position.   (*Id.*)   To meet the minimum standards to qualify for a transfer to a position with higher pay at the same store, the employee's current evaluation must be at least a "solid performer," and the employee cannot have a "written coaching."   (*Id.* at 4–5.)   Walmart also considers "the associate's education, professional licenses/certifications, prior work experience, and performance evaluation history as such factors that may provide insight into the associate's work ethic and

demonstrate whether the associate possesses any unique leadership, collaboration, technological, analytical, problem–solving, professionalism, and/or communication skills." (*Id.* at 5.)

    i. <u>Promotions From Hourly Associate to Assistant Store Manager Trainee</u>

   In order to become a salaried Assistant Store Manager, an employee must be selected for and complete Walmart's manager in training ("MIT") program. (*Id.*) An associate can apply to the program by filing out an online application in store, which is then sent electronically to the District Manager. (*Id.*) If there is an opening, the District Manager will contact the Store Manager to determine if the Store Manager recommends that associate for promotion to the MIT program. (*Id.*) If the associate is recommended, the associate will be interviewed and the District Manager will then determine if the associate should be selected. (*Id.*) The minimum standards required to qualify for a promotion from hourly associate to the MIT program include "having a minimum evaluation rating of 'meets expectations,' being in your current position for at least six months, having at least one year of retail experience with Walmart or another employer, and not having an active written coaching." (*Id.* at 6.) Other factors considered include prior experience in a supervisory position either at Walmart or at another retail store and success in a supervisory position. (*Id.*) "The overwhelming majority of associates selected for the MIT program have past experience working in a supervisory position." (*Id.*) Not having prior supervisory experience does not automatically disqualify an associate from consideration, but "only exceptional associates would be selected in such an instance." (*Id.*) That associate would be required to demonstrate knowledge and experience in what Walmart classifies as the key functions of the Assistant Store Manager, which includes holding a leadership role in a significant area of the store and assisting with personnel or payroll. (*Id.*)

ii.   <u>Promotions From Assistant Store Manager to Co–Manager or Store Manager</u>

Between 2004 and 2005, the minimum requirements for a promotion from an Assistant Store Manager to a Co–Manager or Store Manager position included earning a recent evaluation rating of at least 3.5; working at least six months at the associate's current store; having at least two years is salaried manager experience; and not having any written coachings within the last year.   (*Id.*)

A.   *Individual Allegations*

Plaintiffs allege Walmart paid them less than similarly–qualified or less–qualified male employees and promoted them less quickly and less frequently than similarly–qualified or less–qualified male employees.

1.   *Roberta Crites*

Crites filed her initial charge with the EEOC on May 11, 2012.   (ECF No. 95 at 12.) Crites is a resident of Spencer, West Virginia, and has been employed by Walmart from October 11, 1999 to the present.   (ECF No. 28 at 4, ¶ 19.)   Crites has been employed at the following stores during the following time periods: in Clarksburg, West Virginia, from October 1999 to December 1999; in Spencer , West Virginia, from December 1999 to May 2009; in Ripley, West Virginia, from May 2009 to January 2012; and in Spencer, West Virginia, from January 2012 to present.   (*Id.*)   Crites' titles included Loss Prevention Associate, Sales Associate, Grocery Reclamation Associate, Department Manager, Lead Associate, and Asset Protection Associate. (*Id.* at 22, ¶ 106.)   In 2010, Crites was transferred to the Ripley, West Virginia, store as an Asset Protection Associate.   (*Id.* ¶ 107.)   In January of the same year, Crites applied for a salaried manager position and an asset protection coordinator position.   (*Id.* ¶ 108.)   However, despite her

years of experience in loss prevention, Crites was not offered an interview for the asset protection coordinator position.   (*Id.* ¶ 109.)   A male employee named Tyler, who had no loss prevention experience, was offered an interview, and Shaun Maynor, a male employee with only a year and a half of experience and who had only been employed by Walmart since 2008, was eventually hired for the position.   (*Id.* ¶ 110.)   These hiring decisions were made by Waymon Cogar, the District Asset Protection Manager.   (*Id.* ¶ 111.)   In November 2011, the position was reposted, and Crites again applied.   (*Id.* ¶ 112.)   However, she was again not interviewed and Robert Eaton, a male employee, was hired.   (*Id.*)   Eaton never worked in asset protection and, at that time, Crites had over six years of experience working as an asset protection associate.   (ECF No. 100 at 8.)

In January of 2012, Crites returned to the Spencer, West Virginia, Walmart to work as a pharmacy department manager.   (*Id.* at 23, ¶ 113.)   Throughout 2013, Crites was denied six different promotions.   (*Id.* ¶ 114.)   On May 22, 2013, Crites applied for an hourly trainee position, but she was neither interviewed nor offered the position.   (*Id.*)   Next, on May 31, 2013, Crites applied for an hourly trainee position, but again was neither interviewed nor offered the position.   (*Id.*)   Crites was told she was not eligible for this position because the opening was at the same store where she currently worked.   (*Id.*)   However, Calvin Marks was hired for the position, and he was also then employed at the Spencer, West Virginia, store.   (*Id.*)

On June 16, 2013, Crites applied for an hourly trainee position at the Mineral Wells Walmart Store, and completed an interview but was not hired. (*Id.*)   Subsequently, on July 3, 2013, Crites applied for an assistant manager trainee position, and was again interviewed but not hired.   (*Id.*)   On September 10, 2013, Crites applied for an hourly trainee position, but was neither interviewed nor offered the position.   (*Id.*)   Finally, on November 27, 2013, Crites applied for an

hourly trainee position at the Spencer, West Virginia Walmart Store, but she was neither interviewed nor offered the position. (*Id.*)

In 2015, Crites applied for the following four positions and was neither interviewed nor offered the job: (1) on March 5, 2015, Crites applied for an hourly trainee position at Mineral Wells, West Virginia, store; (2) on March 10, 2015, Crites applied for an hourly trainee position at Ripley, West Virginia, store; (3) in April of 2015, Crites applied for a support manager position at Spencer, West Virginia, store; and (4) in July of 2015, Crites applied for a support manager position at Spencer, West Virginia, store. (*Id.* at 23–24, ¶ 114.) Mike Snodgrass, a male employee, was hired for the April 2015 support manager position, and Mike Mathes, another male employee, was hired for the July 2015 support manager position. (*Id.*)

Finally, in 2016, Crites applied for three promotions and was again denied. (*Id.*) On June 16, 2016, she applied for an AP manager trainee position, and was interviewed but not hired. (*Id.*) Next, on September 6, 2016, Crites applied for an assistant manager trainee position, but as not hired. (*Id.*) On November 12, 2016, Crites applied for a manager trainee position, but she was not hired. (*Id.*) Crites has been employed by Walmart for almost 20 years and she currently works at the Spencer, West Virginia, store in an hourly asset protection position. (*Id.* at 28, ¶¶ 117–118.)

### 2. *Tammy Harrison*

Harrison filed a charge with the EEOC on May 1, 2012, and alleges Walmart discriminated against her on the basis of her sex in both pay and promotions. (ECF No. 28 at 3, ¶ 12.) Harrison is a resident of Cross Lanes, West Virginia, and was employed by Walmart from 1998 to 2006. (ECF No. 28 at 4–5, ¶ 20.) She has been employed at the following stores: Nitro, West Virginia;

Gallipolis, Ohio; Ripley, West Virginia; and South Charleston, West Virginia.   (*Id.*)   Harrison had held the position of customer service manager, department manager, and support manager. (*Id.* at 26, ¶ 122.)

Harrison alleges she applied for a Co–Manager position between five to six times between 2003 and 2006.   (ECF No. 100 at 9.)   In March of 2002, Harrison received a 3.8 rating on her evaluation, which was a prerequisite for applying for a Co–Manager position.   (ECF No. 28 at 27, ¶ 128.)   When Harrison was interviewed for the Co–Manager position, a male District Manager, Stewart Bunker, allegedly told her "[t]here's never going to be a female in my district who will ever exceed my expectations."   (*Id.* at 28, ¶¶ 129–130.)   He then lowered her evaluation to 3.72, in her presence, so that she would be ineligible to apply for the position.   (*Id.* ¶ 129.)

She also alleges that her Store Manager, Chris Rockenstein ("Rockenstein"), told her she could not be promoted within the same store, but male employees George Skinner ("Skinner") and Danny Baisin ("Baisin") were promoted within their same store.   (ECF No. 100 at 9.)   Further, Harrison was told by her District Manager, Eddie Bostic ("Bostic"), and Rockenstein that she would be promoted to Co–Manager if she went to Ashland, Kentucky, to open a new store.   (*Id.*) Once she completed her work in Ashland, she was called into a meeting with Bostic, Rockenstein, and a male employee, Lewis Taylor.   (*Id.*)   The managers stated that Taylor was being promoted to Co–Manager instead of Harrison because he had four children and another on the way.   (*Id.*) Harrison was also told that her husband had a good job.   (*Id.*)   Harrison told Bostic and Rockenstein that Taylor's promotion was discrimination, and she took Rockenstein's comment about her husband having a good job as meaning that it is a man's job to provide for a family.   (*Id.* at 11–12.)   Harrison also states that Rockenstein called the male employees at the South

Charleston store the "boy's club", and that women employees were dismissed from morning meetings to allow the boy's club to chat.  (*Id.*)  Harrison further alleges that Rockenstein made derogatory comments about female customers in thong underwear and stated "that he would like to have his balls played with while walking through the sporting goods department."  (*Id.*)

Harrison alleges she was paid less than Greg Blackburn ("Blackburn"), Tom Harvey ("Harvey"), Danny Baisin ("Baisin"), and Lewis Taylor ("Taylor"), while all were employed as Assistant Store Managers.  (ECF No. 28 at 27, ¶ 134.)  Harrison was aware of three male Assistant Managers with less experience who made $40,000 while she made only $35,000.  (*Id.* ¶ 134.)  Harrison alleges she was promoted to Assistant Store Manager and was paid biweekly in the amount of $1,211.54 in 2001; $1,272.12 in 2002; $1,335.73 in 2003; $1,402.51 in 2004; $1,472.64 in 2005; and $1,693.53 in 2006.  (ECF No. 100 at 10.)  Further, she alleges Taylor was hired as an Assistant Manager Trainee in 2000 and earned $2,416.96 in 2003 and $2,909.40 in 2004 when he worked in the same store as Harrison.  (*Id.*)

### B.  Procedural History

On March 18, 2020, Defendant filed its Motion for Summary Judgment.  (ECF No. 94.) Plaintiff timely responded, (ECF No. 100), and Defendant timely replied, (ECF No. 106).  As such, this motion is fully briefed and ripe for adjudication.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact."  Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   When evaluating such factual issues, the Court must view the evidence "in the light most favorable to the opposing party."   *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production."   *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984).   Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial."   *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."   *Liberty Lobby*, 477 U.S. at 256.   "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff."   *Id.* at 252.

## III.   DISCUSSION

Plaintiffs' Amended Complaint alleges the following two causes of action: (1) disparate treatment discrimination in violation of Title VII of the Civil Rights Act of 1964 and (2) disparate

impact discrimination in violation of Title VII of the Civil Rights Act of 1964.   (ECF No. 28 at 30–32.)   The parties previously agreed to dismiss Plaintiffs' Count II claim for disparate impact. (ECF No. 88.)   Additionally, in her response, Crites withdraws her unequal pay claims.   (ECF No. 100 at 5.)   Accordingly, Plaintiff Roberta Crites' claim for disparate treatment pay discrimination is **DISMISSED**.

Only Crites' claim for disparate treatment promotion discrimination, and Harrison's claims for disparate treatment promotion discrimination and disparate treatment pay discrimination remain.   Defendant seeks summary judgment on all remaining claims.   Each argument is addressed in turn.

### A.  Disparate Treatment Discrimination

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1).   The Act prohibits "overt discrimination," referred to as disparate treatment discrimination, and "also practices that are fair in form, but discriminatory in operation," referred to as disparate impact discrimination.   *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

Disparate treatment discrimination "is the most easily understood type of discrimination" because "[t]he employer simply treats some people less favorably than others because of their" protected status.   *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).   On the other hand, disparate impact discrimination refers to "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."   *Id.*   Further, disparate impact claims do

12

not require proof of a discriminatory motive, while proof of discriminatory motives are "critical" in disparate treatment cases. *Id.*

"A disparate–treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job–related action." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988)). Intentional discrimination can be established through direct or circumstantial evidence. *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), cert. denied, 140 S. Ct. 381 (2019). When there is no direct evidence of discriminatory intent, discrimination can be shown using the burden shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), "to develop an inferential case" of discriminatory intent. *Spencer*, 919 F.3d at 207 (citing *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996)). Under *McDonnell Douglas*, the plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of gender discrimination, the plaintiff must show that "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011); *see also McDonnell Douglas*, 411 U.S. at 802. If the plaintiff meets this burden, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Bonds*, 629 F.3d at 386. Further, if the employer makes this showing, the burden shifts back to the plaintiff who then must show that "the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Id.*

### 3. Crites' Failure to Promote Claim

Between 2010 and 2016, Crites alleges she was denied around fifteen promotions.  (ECF No. 28 at 24, ¶¶ 108–114.)  To prove disparate treatment discrimination, Crites must provide direct evidence of discriminatory intent or establish a *prima facie* case under the burden–shifting scheme established in *McDonnell Douglas* and its progeny.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).  Here, the record provides little to no direct or indirect evidence of discriminatory intent.   Further, for the majority of these promotions, Crites states only that she was denied the promotion without an interview.  (*Id.*)  She relies solely on the denial of those promotions as evidence of discrimination and has produced no other corroborating evidence.  Crites does allege she applied for the support manager position at the Spencer, West Virginia, Store in both April and July of 2015.  (*Id.* at 23, ¶ 114.)  However, her only evidence of discriminatory intent is that, in both circumstances, a male employee was hired for the position. (*Id.*)

Next, in January of 2010 and November of 2011, Crites alleges she applied for a salaried manager position and an asset protection coordinator job in the Ripley, West Virginia, Walmart Store.  (*Id.* at 22, ¶¶ 108, 112.)  With regard to her 2010 application, Crites states she was not even interviewed despite her many years of experience in the loss prevention department.  (*Id.* ¶ 109.)  Crites further states that Tyler LNU, a male employee with no loss prevention experience, was offered an interview, and Shaun Maynor ("Maynor"), a male employee who started with Walmart in 2008 and had only one and a half years of loss prevention experience, was hired.  (*Id.* ¶ 110.)  The District Asset Protection Manager, Waymon Cogar, made these hiring decisions. (*Id.* ¶ 111.)  Additionally, in November of 2011, Maynor left the position of asset protection

coordinator, and Crites again applied. (*Id.* ¶ 112.) However, she was again not offered an interview and a male employee, Robert Eaton ("Eaton"), was hired. (*Id.*)

To establish a *prima facie* case of disparate treatment in promotions, Crites must provide facts that enable this Court to conclude that it is more likely than not that Walmart's failure to promote her was a result of discrimination. Crites must prove that "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *McDonnell Douglas*, 411 U.S. at 802.

First, the Court notes that, under the *McDonnell Douglas* framework, the majority of Crites' promotion claims have no merit because she has failed to provide a single fact in support. *Evans*, 80 F.3d at 959. In her response, Crites appears to abandon the majority of these claims and only focuses on her application for the asset coordinator position. As a result, the Court will only focus on these two promotions.

Crites argues she was qualified for both the 2010 and 2011 asset coordinator job because she was employed by Walmart since October 11, 1999, and had ten to twelve years of asset protection experience at the time of her application. (ECF No. 100 at 8.) While the Court notes that Crites has provided limited evidence regarding her employment history and the similar status of the male applicants, the Fourth Circuit has emphasized that "the burden of establishing a prima facie case of disparate treatment is not onerous." *Evans*, 80 F.3d at 960. Thus, Crites satisfies the "relatively easy test" that she was a qualified applicant who "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.*

15

However, Walmart has articulated legitimate and non–discriminatory reasons for why Maynor and Eaton were hired instead of Crites.   Maynor had law enforcement experience working as a Forest Ranger with the West Virginia Division of Forestry and was an Asset Protection Associate from May 2008 till his promotion in January of 2010.   (ECF No. 100 at 30.) In contrast, Defendant states Crites had a history of leaving and returning to the asset protection division.   (*Id.*)   Between 1999 and 2010, Crites held eleven different positions and was transferred out of the asset protection division three different times.   (*Id.*)   Further, Defendant states that Eaton held extensive managerial retail and asset protection experience prior to working in Defendant's stores and held the positions of Warehouse Projects Manager/Commercial Sales Manager at Surface Foods; General Manager at Subway; and Assistant Manager/Asset Protection at Blockbuster Video.   (*Id.* at 31.)

"Job performance and relative employee qualifications are widely recognized as valid, non–discriminatory bases for any adverse employment decision."   *Evans*, 80 F.3d at 960.   Walmart "has discretion to choose among equally qualified candidates provided the decision is not based upon unlawful criteria . . . ."   *Id.* (quoting *Wileman v. Frank*, 979 F.2d 30, 38 (4th Cir. 1992)). Thus, the burden now shifts back to Crites, and she must present evidence that Walmart's explanations are "not its true reasons, but were a pretext for discrimination."   *Bonds*, 629 F.3d at 386.   Since this is a failure to promote case, Crites must show that she was the better qualified candidate for the position.   *Evans*, 80 F.3d at 960.

However, Crites has presented no evidence to overcome summary judgment.   She has failed to show she was more qualified than either Eaton or Maynor or any other male applicant and has produced no evidence to show gender discrimination was the motivation behind Walmart's

decisions.   Quite simply, an "unsupported speculation is insufficient."   *Id.*   Just like *Evans*, Crites has provided "unsubstantiated allegations and bald assertions concerning her own qualifications and the shortcomings of her co–workers" which fails to disprove Walmart's explanations and fails to show a discriminatory intent.   *Id.*

In opposition, both Plaintiffs spend much of their briefing criticizing Walmart for its record–keeping practices, and its alleged failure to provide a concrete reason for why both Plaintiffs were denied promotions and why Harrison's pay was lower than other male employees.   (ECF No. 100 at 12.)   The United States Supreme Court has emphasized that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."   *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).   Both Plaintiffs attempt to argue that Walmart has produced insufficient evidence to meet its burden because it has not produced statements from the managers who made the decisions. (ECF No. 100 at 12.)   This is a blatant misinterpretation of the standard.

In *Burdine*, the Court held that when the burden shifts back to the defendant, the defendant must "rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons."   *Burdine*, 450 U.S. at 254–55.   The Court goes on to state that "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff," and "[t]o accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection."   *Id.*   Plaintiffs use the Court's "admissible evidence" language as the basis for their arguments.   The Court clarifies what it means by

17

admissible evidence by stating that "[a]n articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Id.* at 256 n.9.   Contrary to Plaintiffs' arguments, the Supreme Court did not require first–hand knowledge or statements from persons present when the decisions were made. *Id.*   Here, Walmart has produced extensive employment records detailing the dates of the disputed promotions, pay rates, and employees work history.   This evidence is supported by documentation and not merely the "argument of counsel," which the Supreme Court cautioned against.

With regards to Crites' promotion claim, Crites argues that Walmart's reasoning is simply based on guesses and are merely speculations as to why Crites was not promoted.   These arguments have no merit.   As discussed above, Walmart has successfully articulated a legitimate and non–discriminatory reason for hiring Maynor and Eaton.   On the other hand, Crites failed to provide any statements, records, or personal knowledge to support her claims.   Thus, Crites has failed to prove a set of facts to enable this Court to conclude that Walmart's failure to promote her was motivated by discrimination.   Accordingly, summary judgment is **GRANTED** as to Plaintiff Roberta Crites' disparate treatment in promotions claim.[3]

### 4.   Harrison's Failure to Promote Claim

Harrison alleges she was discriminated against based on her gender when she was denied five to six promotions between 2003 and 2006.   (ECF No. 100 at 8.)   First, the Court notes that, for the majority of these claims, Harrison does not provide a single allegation in support.   She has

---

[3] Defendant's argue Crites failed to exhaust her administrative remedies for portions of her failure to promote claim. (ECF No. 95 at 24.)   Because the Court has granted summary judgment under an alternative theory, there is no need to address this argument.

failed to provide even the simplest information, including the date she applied or even the total number of promotions she was denied.   In fact, Harrison states she was denied around five to six promotions, but Defendant's records show she was denied four.   (ECF No. 95 at 20.)   Just like Crites, Harrison appears to rely solely on the denial of these promotions as evidence of discrimination.   While the burden to establish a *prima facie* case is "not onerous," Harrison has failed to meet this low threshold for the majority of her claims.   *Evans*, 80 F.3d at 960.   In fact, Walmart provides all factual information for the following persons who were promoted over Harrison:   Raymond Scarberry, Danny Meadows, James Collins, and Tonya Scyoc.   (ECF No. 95 at 20–24.)   Further, Harrison does not discuss these individuals in response, which leads the Court to believe that she has abandoned these claims.   As a result, the Court will only focus on Harrison's allegations that Lewis Taylor, George Skinner, and Danny Baisin were promoted to fill Co–Manager positions for which she applied. (ECF No. 100 at 13.)

To meet her burden, Harrison must provide direct evidence of discriminatory intent or establish a *prima facie* case under the burden–shifting scheme established in *McDonnell Douglas* and its progeny.   *Evans*, 80 F.3d at 959.   First, Harrison states that her Store Manager, Chris Rockenstein, stated she could not be promoted within the same store, but male employees George Skinner and Danny Baisin were promoted within the South Charleston Store where they both worked.   (*Id.* at 9.)   These are the only allegations Harrison provides.   Even assuming these bare bones allegations could establish a *prima facie* case of discrimination, Harrison fails to address any of Walmart's legitimate and non–discriminatory reasons provided in support of these promotions.

First, Walmart states that an employee named Danny Baisin does not exist.   (ECF No. 106 at 8.)   Walmart's records show that a male Assistant Store Manager named Danny Baisden did work at the South Charleston, West Virginia, Store with Harrison, but the two never applied for any of the same Co–Manager positions.   (*Id.*)   Further, Baisden did not receive a promotion to a Co–Manager position until March of 2008, which was over a year after Harrison voluntarily resigned.   Harrison does not address these facts.

Next, Walmart alleges Skinner was selected as a Co–Manager of the South Charleston, West Virginia, Store in July of 2005.   (ECF No. 95 at 11.)   Skinner worked as an Assistant Store Manager at two other Walmart Stores for almost three years and had worked in a management position at a Walmart Store and a Sam's Club for over a year.   (*Id.*)   Further, Skinner had received a most recent performance evaluation of a 4 out of 5, and Harrison's evaluation was only a 3.5 out of 5.   (*Id.*)   Again, Harrison does not attempt to rebut any of Walmart's factual assertions. Accordingly, summary judgment is **GRANTED** with regards to Plaintiff Tammy Harrison's failure to promote claims as it pertains to both Skinner and "Baisin."

Next, Harrison was told by her District Manager, Eddie Bostic ("Bostic"), and her Store Manager, Rockenstein, that she would be promoted to Co–Manager if she went to Ashland, Kentucky, to open a new store.   (ECF No. 100 at 9.)   Once she completed her work in Ashland, she was called into a meeting with Bostic, Rokenstein, and a male employee, Lewis Taylor.   (*Id.*) The managers stated that Taylor was being promoted to Co–Manager instead of Harrison because he had four children and another on the way.   (*Id.*)   Harrison was also told that her husband had a good job.   (*Id.*)   Harrison told Bostic and Rockenstein that Taylor's promotion was discrimination, and she took Rockenstein's comment about her husband having a good job as

20

meaning that it is a man's job to provide for a family.   (*Id.* at 11–12.)   Harrison argues that Rockenstein's comments during this meeting are direct evidence of discriminatory intent.   (*Id.* at 12.)

Further, Harrison states that Rockenstein referred to the male employees at the South Charleston Store as his "boys club" and would dismiss Harrison and the other female employees from morning meetings so the boys club could talk separately.   (*Id.* at 9.)   Additionally, Harrison argues she was qualified for the position because she had worked up the ranks and was offered the job before she initially went to Ashland.   (ECF No. 100 at 9.)

Direct evidence of discriminatory intent includes "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."   *Melendez v. Bd. of Educ. for Montgomery Cty.*, 711 F. App'x 685, 687 (4th Cir. 2017). "Derogatory remarks may in some instances constitute direct evidence of discrimination."   *Id.* However, "in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced."   *Id.*   (quoting *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010).

In addition to Rockenstein's direct comments at the promotion meeting, Harrison has provided evidence of statements that appear to show a culture of derogatory comments toward women in the South Charleston Store.   Further, she alleges her evaluation was lowered simply because she was a female.   Even if these actions do not create a "clear nexus" with the employment decision, Harrison has at least established a *prima facie* case of discrimination. While the Court notes that Harrison has provided limited evidence regarding her employment history and the similar status of the male applicants, "the burden of establishing a prima facie case

21

of disparate treatment is not onerous." *Evans*, 80 F.3d at 960. Thus, Harrison satisfies the "relatively easy test" that she was a qualified applicant who "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.*

However, Walmart has articulated legitimate and non–discriminatory reasons for why Taylor was hired instead of Harrison. Walmart states Taylor received higher performance evaluations than Harrison in both 2003 and 2004. (ECF No. 100 at 21.) For example, Taylor earned performance evaluations of 3.9 of 5 and 4 of 5, which was higher than Harrison's evaluations of only 3.5 of 5. (*Id.*) Further, the notes from Taylor's interview for the position state he was very knowledgeable on financial numbers and the qualities of an effective leader and had demonstrated strong leadership in the past. (*Id.*) Walmart states that, under its promotional policies, Taylor's higher evaluation ratings and exemplary work as an Assistant Store Manager support his selection. (*Id.* at 22.) Thus, the burden now shifts back to Harrison, and she must present evidence that Walmart's explanations are "not its true reasons, but were a pretext for discrimination." *Bonds*, 629 F.3d at 386.

Here, Store Manager Rockenstein's comments about Taylor receiving the promotion to provide for his family and his reference to the male employees as the "boys club" cast doubt on the legitimacy of Walmart's explanation. Since Rockenstein was involved in promoting Taylor, there is a potential that he considered Harrison's gender in his decision. Further, Walmart's policies required employees to have a performance evaluation of 3.5 or higher, among other qualifications, to be eligible for a promotion. (ECF No. 100 at 7.) In 2003, Harrison alleges that District Manager Stewart Bunker lowered her performance evaluation from a 3.8 to a 3.44 because he thought no female employee would exceed his expectations. (*Id.*) From Walmart's own

22

statements, the performance evaluations played a role in determining which employee was chosen for the promotion.   Thus, Harrison has successfully established a *prima facie* case of gender discrimination.   At a minimum, there is an issue of fact surrounding Rockenstein's comments and the context of his statements.   Accordingly, the Court **DENIES** summary judgment on Harrison's failure to promote disparate treatment claim as it pertains to Lewis Taylor.

5.   Harrison's Pay Discrimination Claim

In her Amended Complaint, Harrison alleges she was paid less than Greg Blackburn ("Blackburn"), Tom Harvey ("Harvey"), Danny Baisin ("Baisin"), and Lewis Taylor ("Taylor"), while all were employed as Assistant Store Managers.   (ECF No. 28 at 27, ¶ 134.)   The Court notes that Harrison does not mention Blackburn, Harvey, or Baisin in her response and appears to abandon her claims against these male competitors.   Harrison does mention Baisin but only in reference to her failure to promote claim.   (ECF No. 100 at 9.)   As a result, the Court will only focus on Harrison's pay discrimination claim as it relates to Taylor.

"A prima facie pay–disparity case under *McDonnell Douglas* requires a plaintiff to establish (1) she is a member of a protected class, (2) she was performing her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive."   *Spencer*, 919 F.3d at 207.   Harrison has produced no direct evidence of discrimination, so the Court will proceed under the *McDonnell Douglas* framework.

Harrison alleges she was promoted to Assistant Store Manager and was paid biweekly in the amount of $1,211.54 in 2001; $1,272.12 in 2002; $1,335.73 in 2003; $1,402.51 in 2004; $1,472.64 in 2005; and $1,693.53 in 2006.   (ECF No. 100 at 10.)   Further, she alleges Taylor was

23

hired as an Assistant Manager Trainee in 2000 and earned $2,416.96 in 2003 and $2,909.40 in 2004 when he worked in the same store as Harrison.   (*Id.*)

Assuming these allegations are sufficient to support a *prima facie* case of discrimination, Walmart has articulated legitimate and non–discriminatory reasons for why Taylor was paid at different rates than Harrison.   Walmart states that Plaintiff fails to recognize that Taylor and Harrison both came to the same store with different employment histories and, thus, differing pay rates.   (ECF No. 106 at 11.)   In April 2004, Harrison and Taylor both worked as Assistant Store Managers at the South Charleston Store and reported to Store Manager Rockenstein.   (*Id.* at 12.) Walmart states that Taylor earned more than Harrison because, during that time, Taylor's performance evaluations were higher.   (*Id.*)   For example, Taylor was earned performance evaluations of 3.9 of 5 and 4 of 5, which is higher than Harrison's evaluations of only 3.5 of 5. (*Id.*)   As a result of this, Walmart states Harrison received a five percent merit increase, while Taylor received a six percent increase.   (*Id.*)

Thus, the burden now shifts back to Harrison, and she must present evidence that Walmart's explanations are "not its true reasons, but were a pretext for discrimination."   *Bonds*, 629 F.3d at 386.   Harrison argues Walmart fails to articulate any legitimate and non– discriminatory reasons for these actions, but that argument is easily refuted by the plain language of Walmart's briefing.   (ECF No. 100 at 14.)   As discussed above, Plaintiffs' arguments about the sufficiency of Walmart's evidence has no merit.   (*See* Section III.A.3.)   Harrison does not attempt to rebut any of Walmart's legitimate and non–discriminatory reasons for why Taylor was paid more than Harrison.   Accordingly, summary judgment is **GRANTED** as to Plaintiff Tammy Harrison's disparate treatment in pay claim.

24

B.  *Plaintiffs' Pattern or Practice Claim*

Finally, Defendants seek dismissal of Plaintiffs pattern or practice claim because this type of claim may only be asserted in a class action.   (ECF No. 95 at 31.)   Plaintiffs do not respond.

In their Amended Complaint, Plaintiffs allege there is a pattern in compensation where women who held hourly positions were paid less than similarly–situated men, despite the women having more seniority and higher performance ratings.   (ECF No. 28 at 9, ¶ 42.)   The Fourth Circuit has held that claims alleging a pattern or practice of discrimination can only be asserted in class actions, and not by individual plaintiffs.   *See Williams v. Henderson*, 129 F. App'x 806, 813 n.2 (4th Cir. 2005); *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998), vacated on other grounds, 527 U.S. 1031 (1999).   Accordingly, to the extent Plaintiffs' Amended Complaint could be understood as alleging a pattern or practice claim, that claim is **DISMISSED**.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Defendant's Motion for Summary Judgment, (ECF No. 94), on the issues of (1) Crites' disparate treatment in promotions claim; (2) Harrison's disparate treatment in promotions claim against Skinner and Baisin; and (3) Harrison's disparate treatment in pay claim.   Summary judgment is **DENIED IN PART** on Harrison's failure to promote disparate treatment claim as it pertains to Lewis Taylor.   In addition, the Court **DISMISSES** Plaintiffs' pattern or practice claim.   Plaintiff Roberta Crites' claim for disparate treatment in pay was voluntarily dismissed.   Thus, only Plaintiff Tammy Harrison's failure to promote disparate treatment claim as it pertains to Lewis Taylor remains.

Further, Defendant advises that Plaintiffs Keri Bragg, Marlene Justice, and Charlotte Samples agreed to settle their claims.   (ECF No. 95.)   Accordingly, the Court **ORDERS** that the

causes of action and damages sought by Plaintiffs Keri Bragg, Marlene Justice, and Charlotte Samples are **DISMISSED**.   The Court further **DIRECTS** the Clerk to remove all Plaintiffs, except Tammy Harrison, from the docket as parties to this action.

      **IT IS SO ORDERED**.

      The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

                ENTER:        June 22, 2020

                        _____

                        THOMAS E. JOHNSTON, CHIEF JUDGE